**RECORD NO. 13-4452(L)**
**CROSS APPEAL NO. 13-4497**

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee/Cross-Appellant,*

v.

VINCENT HERNANDEZ,

*Defendant-Appellant/Cross-Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND, BALTIMORE DIVISION

HONORABLE J. FREDERICK MOTZ, PRESIDING

---

**OPENING BRIEF OF APPELLANT/CROSS-APPELLEE**
**VINCENT HERNANDEZ**

---

John A. Bourgeois
Ezra S. Gollogly
KRAMON & GRAHAM, PA
Suite 2600 Commerce Place
1 South Street
Baltimore, Maryland 21202
(410) 7526030 Telephone
jbourgeois@kg-law.com
egollogly@kg-law.com

*Counsel for Appellant/Cross-Appellee*

October 30, 2013

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia  23219 (804) 644-0477
A Division of Lantagne Duplicating Services

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF JURISDICTION........................................................1

ISSUES PRESENTED FOR REVIEW ...................................................2

STATEMENT OF THE CASE................................................................3

STATEMENT OF FACTS .....................................................................5

SUMMARY OF THE ARGUMENT ....................................................23

ARGUMENT ......................................................................................25

    I.     The District Court's denial of Hernandez's motion for a new trial was an abuse of discretion in light of newly discovered evidence demonstrating that the confidential informant, who provided the only direct evidence that Hernandez actually sold drugs, lied about his drug use and attempted to steal drugs from the police ...................25

        a.  Standard of Review .......................................................25

        b.  The evidence discovered after Hernandez's conviction regarding Pat Izer's drug use and deception of the police satisfies all five elements of the *Chavis* Test for determining when a motion for new trial should be granted................................26

            i.  The District Court properly found that evidence of Pat Izer's conduct is newly discovered and the Court can infer due diligence on the part of Hernandez .....................26

           ii.  The District Court erred in finding that evidence of Pat Izer's conduct is not more than cumulative or impeaching because the evidence supports Hernandez's theory that Izer lied to set up Hernandez............................27

i

iii.  The District Court abused its discretion in finding that Pat Izer's conduct is not material to this case .....................30

iv.  The District Court abused its discretion by ruling that the new evidence, if available at the time of the conviction, would not likely have resulted in Hernandez's acquittal at a new trial .....................................31

c.  Even if this court finds that the newly discovered evidence is "merely impeaching," the District Court abused its discretion in denying Hernandez's motion for new trial because the government's case rested entirely on Pat Izer's testimony, and it is now known that Pat Izer is entirely unworthy of being believed .......................................................................................33

II.    The District Court erred in finding that there was substantial evidence to support a finding of guilt beyond a reasonable doubt of conspiracy when there was no direct evidence linking Hernandez to drug dealing (apart from the testimony of the discredited confidential informant), and in finding sufficient evidence to support a conviction on the firearm charges when there was no evidence that Hernandez had any knowledge of or intent to possess the firearm ................................................................37

a.  Standard of Review ....................................................37

b.  There was insufficient evidence to convict Hernandez of conspiracy to distribute and possession with intent to distribute crack in violation of 21 U.S.C. § 846 ...........................38

c.  There was insufficient evidence to convict Hernandez of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) and of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g) .............................................................40

CONCLUSION .........................................................................43

ii

REQUEST FOR ORAL ARGUMENT ................................................................43

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ......................................44

CERTIFICATE OF SERVICE ............................................................................45

iii

# TABLE OF AUTHORITIES

Page(s)

CASES:

*Jackson v. Virginia*,
    443 U.S. 307 (1979)........................................................................37

*Koon v. United States,*
    518 U.S. 81 (1996)..........................................................................31

*United States v. Allen*,
    716 F.3d 98 (4th Cir. 2013) *cert. denied*, 133 S. Ct. 2819 (U.S. 2013) ........38

*United States v. Al Sabahi*,
    719 F.3d 305 (4th Cir. 2013) ...........................................................40

*United States v. Banks*,
    10 F.3d 1044 (4th Cir. 1993) ...........................................................39

*United States v. Burgos*,
    94 F.3d 849 (4th Cir. 1996) ...................................................38, 39, 40

*United States v. Chavis*,
    880 F.2d 788 (4th Cir. 1989) .................................................23, 26

*United States v. Custis*,
    988 F.2d 1355 (4th Cir. 1993) .......................................24, 27, 33, 34

*United States v. Fulcher*,
    250 F.3d 244 (4th Cir. 2001) .......................................25,  26, 28, 30

*United States v. Habegger*,
    370 F.3d 441 (4th Cir. 2004) ...........................................................37

*United States v. King*,
    628 F.3d 693 (4th Cir. 2011) ...........................................................41

iv

*United States v. Leon-Lopez*,
    891 F.Supp. 138 (S.D.N.Y. 1995) ...................................................35

*United States v. Mason*,
    52 F.3d 1286 (4th Cir. 1995) ................................................25, 31

*United States v. Moore*,
    709 F.3d 287 (4th Cir. 2013) .......................................24, 26, 30, 32

*United State v. Norton*,
    277 Kan. 432, 441, 85 P.3d 686 (Kan. 2004) ..............................35

*United States v. Orellana-Osorio*,
    1998 WL 799164 (S.D.N.Y. 1998) ............................................35

*United States v. Piazza*,
    647 F.3d 559 (5th Cir. 2011) .......................................................30

*United States v. Robinson*,
    627 F.3d 941 (4th Cir. 2010) .....................................26, 27, 28, 30

*United States v. Scott*,
    424 F.3d 431 (4th Cir.2005) .......................................................40

*United States v. Singh*,
    54 F.3d 1182 (4th Cir. 1995) .......................................................26

*United States v. Spencer*,
    4 F.3d 115 (2d Cir. 1993) ...........................................................35

*United States v. Sposato*,
    446 F.2d 779 (2d Cir. 1971) .......................................................36

*United States v. Stitt*,
    250 F.3d 878 (4th Cir. 2001) .......................................................31

*United States v. Stockton*,
    788 F.2d 210 (4th Cir. 1986) .......................................................27

v

*United States v. Strickland*,
    245 F.3d 368 (4th Cir. 2001) ........................................................38

*United States v. Taglia*,
    922 F.2d 413 (7th Cir. 1991) ...............................................24, 34

*In re. Winship*,
    397 U.S. 358 (1970)........................................................................32

STATUTES:

18 U.S.C.A. § 922 .................................................................1, 40, 42

18 U.S.C.A. § 924 ........................................................................1, 40

18 U.S.C.A. § 3231 .............................................................................1

18 U.S.C.A. § 3742 .............................................................................1

21 U.S.C.A. § 846 ........................................................................1, 38

28 U.S.C.A. § 1291 ............................................................................1

RULES:

Fed. R. App. P. 4(b) ...........................................................................1

Fed. R. App. P. 33...........................................................................22

OTHER AUTHORITIES:

1 Weinstein's Evidence ¶ 401[07] (1985).......................................28

# STATEMENT OF JURISDICTION

### A.    Subject Matter Jurisdiction

This case arises out of the conviction of Appellant Vincent Hernandez for violating federal criminal statutes 21 U.S.C. § 846, 18 U.S.C. § 924(c), and 18 U.S.C. § 922(g).   The District Court has original jurisdiction over this action pursuant to 18 U.S.C. § 3231.   Hernandez was sentenced to ten years' imprisonment.

### B.    Appellate Jurisdiction

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, which provides for appeals from final decisions of district courts, and 18 U.S.C. § 3742(a), which provides for appeals of sentences, and Rule 4(b) of the Federal Rules of Appellate Procedure.   Hernandez timely filed a notice of appeal on June 10, 2013 from the District Court's final judgment, which was entered on June 10, 2013.

## ISSUES PRESENTED FOR REVIEW

I.     Was the District Court's denial of Hernandez's motion for a new trial an abuse of discretion in light of newly discovered evidence that met the *Chavis* test and wholly impeached any remaining credibility of the confidential informant, the only witness who claimed to see Hernandez dealing drugs?

II.    Did the District Court err in finding that there was substantial evidence to support a finding of guilt beyond a reasonable doubt when there was no direct evidence linking Hernandez to drug dealing (apart from the testimony of the discredited confidential informant), no evidence that Hernandez had any knowledge of the existence of the firearm used to convict him, and no evidence that Hernandez intended to possess that firearm?

## STATEMENT OF THE CASE

On October 13, 2011, in a superseding three count indictment, Hernandez was charged with conspiracy to distribute cocaine base ("crack"), possession of a firearm in furtherance of a drug trafficking crime, and being a felon in possession of a firearm.  (J.A. 20–23).

Hernandez pleaded not guilty and elected to waive his right to a jury trial. The bench trial took place before the Honorable J. Frederick Motz on January 24 and 25, 2012.  (J.A. 35–385).  At trial the Government presented nine witnesses: six police officers, the confidential informant, an alleged co-conspirator, and the rightful owner of the gun involved in the charges.  The defense did not present any witnesses, but through cross-examination and argument presented a simple theory: the Government's confidential informant set Hernandez up.

The only witness who claimed to possess first-hand knowledge that Hernandez dealt drugs was the confidential informant.  The alleged co-conspirator could not say that he knew Hernandez dealt drugs, or that he knew Hernandez had any "customers."  (J.A. 277–78, 292–95).  The Government could not conclusively demonstrate that Hernandez lived at the home from which most of the concrete evidence was discovered, including all of the drug paraphernalia allegedly related to Hernandez; and, indeed, evidence was introduced at trial tending to prove that the house was not Hernandez's residence.  (J.A. 548; Sealed Vol. 1).

3

Judge Motz specifically stated that he did not find the confidential informant to be trustworthy. (J.A. 386). Nevertheless, at the conclusion of the evidence, Judge Motz found Hernandez guilty on all counts.

On March 2, 2012, counsel for the Government sent counsel for Hernandez a letter stating that the confidential informant relied upon by the Government in Hernandez's case was caught attempting to steal crack cocaine from a controlled buy he was participating in as a confidential informant. (J.A. 405–06).

On March 20, 2012, Hernandez moved for a new trial on the basis of newly discovered evidence. (J.A. 397–404). Judge Motz denied that motion on May 9, 2012 (J.A. 411), and sentenced Hernandez to a total of ten years' imprisonment on May 30, 2012. (J.A. 499–518). Hernandez appeals from both the conviction and the denial of the motion for new trial.

## STATEMENT OF FACTS

On January 6, 2010, members of the Washington County Narcotics Task Force ("Task Force") executed a search warrant on 20107 Daniels Circle in Hagerstown, Maryland. Hernandez was present during the search and was arrested on suspicion that he was involved in illegal distributions of controlled dangerous substances.

Before executing the warrant, the Task Force had used Patrick Izer, a career confidential informant and habitual drug user, to conduct four controlled purchases of crack. The earlier purchases, which are detailed below, took place on November 16, 2009, November 30, 2009, December 29, 2009, and January 6, 2010. During the first two controlled buys, Izer purchased drugs from a woman named Robin Pelley. During the third and fourth buys, Izer claimed to have purchased drugs directly from Pelley's supplier, whom he called "Barack," at 20107 Daniels Circle.

Ultimately, Hernandez was charged with and convicted of drug related offenses. At trial, the Government presented only one witness who testified that Hernandez dealt drugs: Izer. Izer testified that Hernandez was "Barack," *i.e.*, Pelley's supplier. The Defense's theory was that Izer set up Hernandez to ensure future access to drugs because Izer thought that "catching" a drug dealer would

ensure that the Task Force would continue to use Izer in controlled buys where Izer could steal some of the drugs.

Just over one month after Hernandez was convicted, Izer was caught attempting to steal drugs from an unrelated controlled buy he was conducting at the direction of the Task Force.

Despite this newly discovered evidence concerning Izer's criminal conduct, the District Court denied Hernandez's motion for a new trial and sentenced Hernandez to ten years' imprisonment.

### I.    November 16, 2009

On November 16, 2009, Patrick Izer, a career confidential informant and habitual drug user, was used to conduct a "controlled buy" of crack.

Izer previously informed the Task Force that he knew a woman, Robin Pelley, who could sell him crack. (J.A. 56).  The Task Force authorized Izer to contact Pelley.  When he did so, she stated that she needed to go to her supplier, and would meet Izer at Rocky's Pizza in Hagerstown to get the money to pay for the crack.  (J.A. 56, 58).  Agent Bryan Glines testified that before the controlled buy he searched Izer "inside of each pocket, any crevice that he might be able to hide anything on his person." (J.A. 57).  Agent Glines acknowledged that he did not strip-search Izer, although he could have.  (J.A. 104–05).  Agent Glines also searched Izer's vehicle, gave Izer $100 of prerecorded funds (traceable money),

and fitted him with a recording device. (J.A. 57–58). There were four other officers involved in monitoring the controlled buy, Agents Lewis, Toston, Fortson, and Sergeant Kearns. (J.A. 58).

When Pelley and Izer met, Izer got into Pelley's car, gave her the prerecorded funds, and got out of Pelley's car. (J.A. 63–64). Pelley, followed by Agents Lewis, Toston, Fortson, and Sergeant Kearns, drove to the intersection of Kellys Lane and Daniels Circle. (J.A. 64). Agent Fortson observed an African American male get into the passenger seat of Pelley's vehicle, and they drove away. (J.A. 121–22). Agent Glines, from another location, observed an African American male exit Pelley's vehicle. (J.A. 65).

Pelley then drove back to Rocky's Pizza. (J.A. 65). Izer once again got out of his car and into Pelley's. (J.A. 65). After breaking off a portion of the crack to keep for herself as "payment," Pelley gave the crack to Izer. (J.A. 66).

Izer and the officers then drove to a different location. Izer gave the crack to the officers and was searched. (J.A. 66–67). His car was also searched. (J.A. 67). According to Agent Glines, the officers did not arrest Pelley because they "wanted to further the investigation to better try to identify Ms. Pelley's source." (J.A. 68).

Izer noted that Pelley "didn't say who her supplier was at the time." (J.A. 160).

7

There was no evidence of involvement of anyone from 20107 Daniels Circle in the November 16 controlled buy. Nor was there evidence of involvement of a Hispanic male (Hernandez is Hispanic). There was no identification of Hernandez.

## II.    November 30, 2009

On November 30, 2009, the Task Force conducted another controlled buy. This time, Agent Glines contacted Izer and asked him to set up a purchase of crack from Pelley. (J.A. 68). Before the buy, Izer got into a vehicle with Agents Glines and Lewis and drove to Daniels Circle. (J.A. 69). Izer pointed out 20107 Daniels Circle and advised the Agents that this was where Pelley would probably go to meet her supplier, whom she referred to as "Barack." (J.A. 69). It is unclear when or from whom Izer got this information.

The Task Force agents searched Izer (but, again failed to strip-search him) and his car, fitted Izer with a recording device, and gave him money for the controlled buy. This time, the Task Force increased the purchase to $150 worth of crack. (J.A. 69–70). Again, several units performed surveillance of the controlled buy.

Pelley met Izer at Rocky's Pizza, and again Izer got into her car, gave her the prerecorded funds, and got back into his own vehicle. (J.A. 71).

Agents Fortson and Toston were positioned at the corner of Kellys Lane and Daniels Circle where Pelley had picked up the unidentified African American male

8

on November 16, 2009. (J.A. 123). Agent Fortson testified that on November 30, 2009 he watched "two black males come from the park area behind the buildings and approach [Pelley's] red neon." (J.A. 124). One of the males got into the passenger seat of Pelley's vehicle. The other drove away in a blue Hyundai. (J.A. 125). No additional evidence about the blue Hyundai was introduced.

Sergeant Curtis Wood of the Task Force was assigned to watch the front of the "target house," 20107 Daniels Circle. Sergeant Wood observed two African American males exit the house and walk toward the playground. (J.A. 145). About four minutes later Pelley's vehicle pulled up and an African American male exited the car and then entered 20107 Daniels Circle. (J.A. 145).

Pelley returned to Rocky's Pizza. When Izer got into Pelley's car, Pelley broke off a piece of crack. Pelley asked Izer if he had his bowl or pipe with him indicating, obviously, that she wanted to smoke the crack cocaine immediately. (J.A. 180). Izer responded that he had no pipe.

Izer debriefed with the Task Force members and was again searched to ensure he was free of prerecorded funds and drugs. Again, the Task Force failed to strip-search Izer. (J.A. 73, 105, 181–82).

Although this second controlled buy involved 20107 Daniels Circle, there was, again, no evidence that Hernandez was involved. The unidentified males

were African American, as stated by multiple Task Force members.  Izer identified

Pelley's supplier as "Barack," not Vincent Hernandez.

II.    **December 29, 2009**

About a month after the Task Force determined the location of Pelley's

supplier, Izer contacted the Task Force.  (J.A. 74).  Izer told the Task Force that he

could purchase crack cocaine directly from Pelley's supplier, whom he referred to

as "Vinnie" or "Barack."  (J.A. 74).

When asked how he was able to buy directly from the supplier, Izer

explained that one night, when it was snowing, Pelley needed a ride to her

supplier's house, which Izer gave her because his vehicle had four-wheel drive.

(J.A. 163).  Izer let Pelley use his phone to call the supplier because she didn't have

any minutes left on her phone.  (J.A. 163).  As a result, Izer learned Pelley's

supplier's address and phone number.  Izer testified that, before he called the Task

Force to suggest the controlled purchase, he contacted Pelley's supplier without

authorization.  Izer told the supplier that Izer was "tired of giving up [his] stuff for

people to get it for [him]."  (J.A. 165).  Izer said that Pelley's supplier "pretty much

directed [him] to come over."  (J.A. 165).

Instead of reprimanding Izer for purchasing crack outside the direction of the

Task Force, and for having knowledge of Pelley's supplier for some period of time

10

before contacting the Task Force, the Task Force again engaged Izer to make a controlled buy, this time cutting Pelley out of the picture.

Once again Izer and his car were searched, Izer was fitted with a recording device, and he was given prerecorded funds, this time $200. (J.A. 74). The Task Force had surveillance vehicles in the area around 20107 Daniels Circle.

Agent Fortson testified that Izer parked his car, entered the front door of 20107 Daniels Circle for a "matter of seconds" and then left. (J.A. 136). Izer would later claim that during his brief time at the front door, he purchased drugs from Hernandez. (J.A. 168).

No Task Force officers observed Hernandez. No recording documents Hernandez, although Izer was wearing an audio-video recording device that did record an unclear male voice. At trial, the only evidence that Hernandez was involved came from Izer.

### IV.    January 6, 2010

Agent Glines obtained a search and seizure warrant for 20107 Daniels Circle that was executed on January 6, 2010. (J.A. 78).

Before executing the warrant on January 6, however, the Task Force again used Izer to make a controlled purchase. (Glines 44). The Task Force followed the same procedure as before and provided Izer with $200 of pre-recorded funds. (J.A. 78).

11

Agent Fortson rode in Izer's car to aid in executing the search warrant immediately after the controlled purchase. (J.A. 129). Izer approached 20107 Daniels Circle, and returned with crack cocaine. (J.A. 130). Agent Fortson was unable to see any person with whom Izer met. (J.A. 130).

After Izer returned to his vehicle and gave Agent Fortson the crack, the Task Force agents executed the search and seizure warrant on 20107 Daniels Circle. The agents entered 20107 Daniels Circle and immediately proceeded to the third floor where three people, Hernandez, Raquel Diaz, and Diaz's child were located. (J.A. 82). Hernandez was coming out of the bathroom at the top of the steps. (J.A. 83). The toilet had just been flushed, Hernandez had wet hands, and there was water around the toilet. (J.A. 83).

The Task Force searched the house. The agents determined that there were three bedrooms upstairs: the master bedroom from which Diaz emerged, a child's bedroom, and a male's bedroom. (J.A. 85–86). In the "male's" bedroom, agents found Hernandez's identification card. (J.A. 87). That card, however, listed a different address than 20107 Daniels Circle. (J.A. 111).

From the "male's" bedroom, agents also recovered a shoebox that was inside a "Finish Line" store bag that was in a closet. (J.A. 193). Inside that shoe box was a .380 caliber handgun and $2,860 in cash. (J.A. 193). The agents found prerecorded funds from the controlled purchases conducted on November 16 and

December 29. (J.A. 84). They did not find any prerecorded funds from the November 30 or the January 6 purchases. (J.A. 84). The bag also contained a holster for a handgun and cash. (J.A. 193, 195). Torn plastic sandwich bags and a box containing empty sandwich bags were found in a dresser in the room. (J.A. 193–94). Also in that dresser was a digital scale with residue, loose white rock residue, and a razor blade. (J.A. 194, 212). There were papers with names and numbers on them located in the dresser. (J.A. 212.) One of the numbers belonged to "Des," and the other numbers matched numbers stored in Hernandez's phone. Underneath the bed, in another shoe box, the agents located a box of Remington .380 bullets. (J.A. 325–326).

The agents recovered two cellular telephones from the house. Both were located on the second floor of the building in the living room. (J.A. 195). One was a Blackberry, and one was a Boost Mobile phone. Also on the second floor, in a dining room hutch, the agents located a Sprint cellular telephone bill issued to Hernandez at 20107 Daniels Circle.

Hernandez was arrested.

## V.    Trial

On October 13, 2011, the Grand Jury issued a superseding indictment charging Hernandez with: (1) conspiracy to distribute and possession with intent to distribute a mixture or substance containing 280 grams or more of cocaine base;

13

(2) possession of a firearm in furtherance of a drug trafficking crime; and (3) being a felon in possession of a firearm.  (J.A. 20).

Hernandez elected to waive his right to a jury trial, and the case proceeded before the Honorable J. Frederick Motz on January 24th and 25th of 2012.  At trial, the Government presented nine witnesses.  Six were Task Force agents.  Not a single Task Force agent identified Hernandez independent of Izer's information or the search of 20107 Daniels Circle.  One witness, Raymond Mills, was the rightful owner of the handgun recovered at 20107 Daniels Circle.  Another witness was Destini Allen, a convicted drug dealer accused of being a co-conspirator in this case.  And the only witness who testified from first-hand knowledge that Hernandez was Pelley's supplier and a drug dealer was, of course, Izer.

Izer admitted at trial that he was a professional government informant.  He explained that he became a confidential informant some 12-14 years earlier.  (J.A. 155).  Izer testified that the reason he became a confidential informant was that he had "a lot of friends that are police officers and detectives and stuff, that just, you know, they knew [his] problem and they figured it would kind of help [him].  And [he] could make some extra money, clean up some of the . . . people off the streets."  (J.A. 155).  Izer claimed that he had been making "extra money" and helping to "clean up" the streets for 14 years.

14

Izer's testimony also made clear that he still used drugs, claiming that it had "been a month or so" since he last used. (J.A. 153). Izer testified that, although he was trying to quit drugs, he had not stopped. (J.A. 154). Izer claimed that despite working with the Government on "probably a hundred or more controlled buys," he continued to use drugs, stating that the reasons for his continued drug use were "people, places, and things." (J.A. 176, 154). Izer claimed that the Task Force knew he was a drug user and that his drug use had helped him to be a successful confidential informant, stating that he had "bought from 30 people, at least, that's been arrested." (J.A. 173). Izer explained: "You know, it's a pretty good record. And, you know, you really can't do that unless you're using drugs." (J.A. 173).

When discussing his initial involvement with the Task Force, Izer explained that, after a failed attempt to buy drugs, he told Agent Glines he could make a purchase from a woman named "Robin Pella." Izer explained that he knew her because "she partied and she used" and that he had purchased cocaine from her in the past. (J.A. 157).

Izer testified that, when he first purchased drugs from Pelley on November 16, Pelley did not tell Izer where she got the drugs. (J.A. 160). Izer's testimony established that when he purchased drugs from Pelley on November 29, he had no contact with anyone other than Pelley. (J.A. 160–61). At some point, according to Izer, Pelley told Izer that her supplier's name was "Barack." (J.A. 165).

15

After Izer's controlled buys from Pelley, he apparently continued to use and buy drugs from Pelley, albeit without authorization from the Task Force.  Because of that obviously illegal behavior, Izer claimed he was able to get the address and phone number of Pelley's supplier.  Izer bypassed Pelley and bought directly from her supplier.  (J.A. 164).  Izer testified that although he knew it was illegal for him to purchase drugs without the direction of the Task Force, he "never signed a [Task Force] rule" that prohibited such purchases.  (J.A. 181).

When asked about his direct connection with Hernandez, Izer stated that he "never got his [the supplier's] direct name from him. [Pelley] called him Barack." Izer confirmed that he never used "Barack's" name with him.  (J.A. 165).  Izer did, however, identify Hernandez at trial as the person from whom he bought drugs. (J.A. 168).

In anticipation of Hernandez's theory of defense, the Government asked Izer whether he hid drugs on his person:

> A     That would make no sense.  I mean, no, I didn't.  But that would make no sense to do that.  You would have to pay for the crack. And, you know, I was there to make money.
>
> Q     Right.  I mean you were [to] make how much per buy?
>
> A     $60 per buy.
>
> Q     In Maryland?
>
> A     Correct.

16

Q     All right.  So if you were to have to give cocaine over to the police, that would have cost you money to purchase, correct?

A     Correct.  That would have defeated the whole purpose of what I was there for.

(J.A. 162).

Izer was also asked about the searches of his car and whether his car was messy (which might have prevented an effective search and enabled Izer to conceal drugs during the controlled buys).  Izer agreed that "there might have been some ashes on the console."  (J.A. 176).

Izer testified that he was very familiar with the police searches that occur before and after every buy claiming: "Every buy I've done, you know, from 14 years ago, you're searched before and after.  They don't miss that in any way.  I mean, that defeats the police giving up their money and, you know, all the manpower out there to do the jobs."  (J.A. 182).

Destini Allen also testified on behalf of the Government.  Allen claimed that he was an acquaintance of Hernandez and that he sold drugs to Hernandez.  Allen said that he knew Hernandez as "VinRoc."  (J.A. 276).  Allen said he never heard anyone call Hernandez "Barack."  (J.A. 276).

Allen admitted that Hernandez never talked about having "customers" or working with other people.  (J.A. 277–78).  Allen could not testify that he knew Hernandez sold drugs (J.A. 292).

17

The Government introduced notebooks that Allen claimed were "money logs" recording what people owed to Allen for purchases of drugs. The money log contains a number of entries for "VinRoc" or "VR." (J.A. 1024–41). Each "VR" or "VinRoc" entry says "1000" with the amount never changing. Allen testified that each "VR" or "VinRoc" entry represents a separate sale to Hernandez, despite the fact that the "amount owed" never changed. (J.A. 272). Allen was unsure what dates he sold drugs to Hernandez. (J.A. 287). He also testified that the money log was not useful to keep track of sales of drugs because he "knew without them" referring to the entries in the log book. But then Allen testified that the reason he used the money log is that it could be difficult to remember sales when he was "high." (J.A. 288). Allen acknowledged that he could not say with certainty how many times he sold drugs to Hernandez. (J.A. 288). Allen had never heard of either Pelley or Izer. (J.A. 295).

The Government also introduced text messages between Allen's and Hernandez's phones that, according to Allen, reflected discussions regarding Hernandez giving money to the mother of Allen's child, and Hernandez giving money to Allen. (J.A. 914–55). The Government introduced pictures of Hernandez and Allen together. (J.A. 1010–23).

After hearing testimony from the Task Force agents, the owner of the handgun, Allen, and Izer, Judge Motz ruled from the bench. Judge Motz found

18

Hernandez guilty on all counts. Judge Motz determined that only 28 to 280 grams were involved in the conspiracy charged in Count I.

With regard to Izer, Judge Motz said:

In terms of the rest of the case, as I -- I think the proper way to review Mr. Izer is I -- again, I wouldn't trust him more than I could see him, but I saw him. And I -- as I say, as a drug addict I think he is willing and do I think he broke the rules here, I think that's a very serious condemnation. I don't think that proves that he lied about transactions that he was engaged in.

(J.A. 387–88).

Judge Motz went on to explain, "[t]he big point is that I think he was properly searched. And I think it doesn't make any sense at all to believe, either for the reasons stated about the value of the crack as opposed to what he was getting paid, I think he was searched." (J.A. 388).

Judge Motz also made the following findings. He determined that, because money from the controlled buys was found in the room at 20107 Daniels Circle, Hernandez was involved in the transactions associated with that address. (J.A. 385–93). He found that the room was, in fact, used by Hernandez for the following reasons: Hernandez's ID was in the room; the Sprint cell phone bill in Hernandez's name was downstairs; there were notes in the room which recorded phone numbers that correlated to those stored in Hernandez's phone; and Allen testified that he had seen Hernandez with the gun that was recovered from the closet. Judge Motz also found that Hernandez flushed prerecorded money down

19

the toilet just before officers arrested him. Judge Motz found beyond a reasonable doubt that Hernandez was mistaken for an African American male and was, in fact, one of the people observed by the officers during the November 30, 2009 buy. Finally, Judge Motz found that the firearm in Hernandez's room was used in connection with drug trades. (J.A. 385–93).

## VI.    Motion for a New Trial

On March 2, 2012, just over one month after Hernandez was found guilty, the Government sent a letter to Hernandez's counsel advising that "subsequent to the trial of Vincent Hernandez, Pat Izer participated in a controlled purchase with the Washington County Narcotics Task Force, and was found to have kept several grams of crack cocaine involved in the purchase." (J.A. 406). A few days later, the Government sent a follow-up letter that documented the following:

> On Tuesday February 21, 2012 the Washington County Narcotics Task Force utilized Patrick lzer, to make a controlled purchase from an individual referred to herein as "the Target." At the conclusion of this controlled purchase Mr. Izer concealed some of the crack cocaine he had purchased inside of his vehicle.
>
> * * * *
>
> Agent Glines searched Mr. Izer prior to the beginning of this investigation and found that he was free of any CDS, contraband and money. Mr. Izer would be utilizing a personally owned vehicle for this operation. Agent Toston searched this vehicle prior to the beginning of this operation and found it to be free of any CDS, contraband and money. Mr. Izer was issued $500 of pre-recorded Task Force Funds to make a controlled purchase of crack cocaine from the Target.

20

At approximately 9:52 PM, Mr. Izer arrived at the location and parked his vehicle. Through a series of text messages and telephone calls; Mr. Izer and the Target agreed to meet. At approximately 10:10 PM, Mr. Izer met with the Target. Mr. Izer handed the Target $500 of pre-recorded Task Force Funds as the Target handed Mr. Izer three plastic bags (two larger bags and one smaller bag) each containing what Mr. Izer believed to be crack cocaine. Mr. Izer and the Target spoke briefly and they separated. Mr. Izer walked back to his vehicle.

* * * *

At approximately 10:20 PM, Mr. Izer advised Agent Fortson that the two clear plastic bags (one larger bag and one smaller bag), each containing an off white crystalline substance, were located on his front passenger seat. Agent Fortson located those plastic bags and recognized the off white crystalline substance to be' crack cocaine from his knowledge, training and experience as a police officer. A subsequent field test tested positive for crack cocaine, a Schedule II controlled dangerous substance.

Agent Glines searched Mr. Izer after the controlled purchase and found that Mr. Izer was free of any CDS, contraband and money. Agent Toston and Agent Fortson searched Mr. Izer's vehicle after the controlled purchase and found it to be free of any money, however, Agent Fortson located a clear plastic bag that contained an off white crystalline substance hidden under the cup holder in the center console of the vehicle. Agent Fortson knows that the off white crystalline substance is crack cocaine through his knowledge, training and experience as a police officer. Agent Fortson also knows through his knowledge, training and experience as a police officer that the quantity of crack cocaine inside of the bag, and the fact that the larger bag was being concealed, that the amount is in sufficient quantity to be in possession with the intent to distribute.

It should be noted that the crack cocaine in the plastic bag located inside of Mr. Izer's vehicle is packaged in the same manner as the crack cocaine in the other two bags that Mr. Izer purchased from the Target. It should also be noted that the value of the crack cocaine that

was concealed inside of Mr. lzer's vehicle is worth approximately $200.

(J.A. 408–10).

Prior to sentencing, on March 20, 2012, Hernandez filed a Motion for New Trial pursuant to Federal Rule of Criminal Procedure 33(a). (J.A. 397). Hernandez argued that the evidence disclosed in the Government's March 2 letter was newly discovered, that Hernandez had exercised due diligence, that the newly discovered evidence was not merely cumulative or impeaching, that the evidence was material to the issues of the trial, and that it was probable that a retrial would result in an acquittal.

The Government opposed the motion. Although the Government agreed with Hernandez that the evidence was newly discovered and that Hernandez had exercised due diligence, it argued that the evidence was merely impeaching and cumulative, and was immaterial to Hernandez's trial. The Government disputed that the newly discovered evidence would result in an acquittal at a retrial.

Judge Motz agreed with the Government stating that although the newly discovered evidence was "disturbing," it did not "disprove defendant's guilt." Judge Motz asserted that it was "other evidence, including the testimony of Destini Allen, upon which the conviction was based." (J.A. 411).

On May 30, 2013, Hernandez was sentenced to a total of ten years imprisonment.

22

## SUMMARY OF ARGUMENT

This case presents two issues: (1) whether the trial court should have granted the motion for a new trial in light of the new evidence regarding Izer that was discovered post-trial; and (2) whether the evidence presented at trial was sufficient to support Hernandez's convictions.

The trial court abused its discretion in denying Hernandez's motion for a new trial based on its finding that the new evidence was merely impeaching and did not "disprove" Hernandez's guilt.  For the trial court to grant a motion for a new trial, a defendant must satisfy a five part test demonstrating that: (1) the evidence is newly discovered; (2) the defendant exercised due diligence; (3) the new evidence is not merely impeaching or merely cumulative; (4) the evidence is material to the issues involved; and (5)  the new evidence would result in an acquittal at a new trial.  *United States v. Chavis*, 880 F.2d 788, 793 (4th Cir. 1989) ("*Chavis* Test").

Although the trial court agreed with Hernandez that the evidence of Pat Izer's post-trial conduct was newly discovered, and that Hernandez exercised due diligence, the trial court abused its discretion in finding that the evidence was merely impeaching.  The newly discovered evidence directly supports Hernandez's chief defense—that Izer set him up.  Even if the evidence was merely impeaching, this Court has recognized that a new trial might be appropriate where the

23

Government's case rests on a witness who is proven to be "utterly unworthy of being believed." *See United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir. 1993) (quoting *United States v. Taglia*, 922 F.2d 413, 415 (7th Cir. 1991)). Izer is precisely that type of witness.

Moreover, the trial court abused its discretion in finding that the newly discovered evidence would not result in an acquittal at a new trial because that evidence did "not disprove" Hernandez's guilt. The trial court considered the newly discovered evidence in the context of the January 24 and 25, 2011 trial, rather than a hypothetical new trial. At a new trial, Hernandez would not be required to disprove his own guilt. Rather, the Government would be required to prove Hernandez's guilt again, something it likely could not do in light of the newly discovered evidence. In light of the newly discovered evidence, moreover, Hernandez may have elected a jury trial. The trial court was required to consider the newly discovered evidence in the context of a new, hypothetical trial, not the already completed trial. *Cf. United States v. Moore*, 709 F.3d 287, 292 (4th Cir. 2013).

The evidence presented at trial was insufficient to convict Hernandez of any of the counts charged. There was no evidence that Hernandez knew about any conspiracy, let alone knowingly participated in a conspiracy to distribute drugs, apart from the testimony of Destini Allen, who did not testify that Hernandez sold

drugs. Moreover, although the gun was clearly found in proximity to drug paraphernalia, there is no evidence that Hernandez knew it was there, let alone possessed it with the intent to use it in furtherance of any drug trafficking crime. Although Allen generally linked Hernandez to the gun, Allen's testimony did not establish Hernandez's knowledge or intent to possess the firearm.

In short, newly discovered evidence that directly supported Hernandez's theory of defense should have led the trial court to grant a new trial, and the evidence presented by the government at trial was insufficient to support Hernandez's conviction for any of the charges.

## ARGUMENT

**I.    The District Court's denial of Hernandez's motion for a new trial was an abuse of discretion in light of newly discovered evidence demonstrating that the confidential informant, who provided the only direct evidence that Hernandez actually sold drugs, lied about his drug use and attempted to steal drugs from the police.**

### a.  Standard of Review

This Court reviews a district court's decision to grant or deny a motion for a new trial under an abuse of discretion standard. This Court does not "substitute its judgment for that of the district court; rather [it] must determine whether the court's exercise of discretion, considering the law and the facts, was arbitrary or capricious." *U.S. v. Fulcher*, 250 F.3d 244, 249 (4th Cir. 2001) (quoting *United States v. Mason*, 52 F.3d 1286, 1289 (4th Cir. 1995)).

25

**b. The evidence discovered after Hernandez's conviction regarding Pat Izer's drug use and deception of the police satisfies all five elements of the *Chavis* Test for determining when a motion for new trial should be granted.**

In determining whether to grant a motion for new trial, the Fourth Circuit uses a well-established five-part test consisting of the following questions: (1) is the evidence newly discovered; (2) are facts alleged from which the court may infer due diligence on the part of the movant; (3) is the evidence relied upon not merely cumulative or impeaching; (4) is the evidence material to the issues involved; and (5) would the evidence probably result in acquittal at a new trial? *Moore*, 709 F.3d at 292 (citing *Chavis*, 880 F.2d at 793).

Generally, all five factors must be present for the grant of a new trial, though this Court has recognized the possibility that a new trial might be appropriate even if all five elements are not satisfied. *United States v. Robinson*, 627 F.3d 941, 948 (4th Cir. 2010); *United States v. Fulcher*, 250 F.3d at 249; *Custis*, 988 F.2d at 1359.

**i. The District Court properly found that evidence of Pat Izer's conduct is newly discovered and the Court can infer due diligence on the part of Hernandez.**

The Government agrees, and the District Court found, that the evidence of Pat Izer's illegal and deceptive conduct was newly discovered. Newly discovered evidence is "evidence discovered since the trial." *Fulcher*, 250 F.3d at 250 (quoting *United States v. Singh*, 54 F.3d 1182, 1190 (4th Cir. 1995)). Evidence of

26

Pat Izer stealing and concealing crack from the very same Task Force agents who worked with Izer on Hernandez's case is certainly "newly discovered."

The District Court also found that Hernandez satisfied the second part of the *Chavis* Test that requires that a defendant exercise due diligence.   As the Government pointed out in its opposition to Hernandez's motion for a new trial, no amount of cross-examination or investigation could have discovered Izer's future conduct.  The District Court properly held that Hernandez exercised due diligence in this respect.[1]

> ### ii. The District Court erred in finding that evidence of Pat Izer's conduct is not more than cumulative or impeaching because the evidence supports Hernandez's theory that Izer lied to set up Hernandez.

Newly discovered evidence that is merely cumulative or merely impeaching is not grounds to grant a motion for a new trial. *Robinson*, 627 F.3d at 949. "[N]ew evidence going only to the credibility of a witness does not generally warrant the granting of a new trial." *Custis*, 988 F.2d at 1359 (citing *United States v. Stockton*, 788 F.2d 210, 220 (4th Cir. 1986)).   A new trial is appropriate, however, when evidence "directly support[s] some alternate theory of the crimes"

---

[1]   Although Mr. Hernandez acknowledges that some courts in other jurisdictions have held that a subsequent crime of a government witness is not "newly discovered" because it could not have been available to the defendant at trial, the evidence here is more akin to a statement made by a witness after trial.   After all, Mr. Izer's testimony and illegal conduct are closely related in time, and the relevant context—a purportedly controlled transaction in which Mr. Izer was working as the Washington County Narcotics Task Force's paid informant—is identical.

or provides a justification for the defendant's actions. *See Robinson*, 627 F.3d at 949 (citing *Fulcher*, 250 F.3d at 250–51).

In this case, the new evidence of Pat Izer's conduct is not cumulative. "'Evidence is cumulative if repetitive, *and* if the small increment of probability it adds may not warrant the time spent in introducing it.'" *Fulcher*, 250 F.3d at 250 (quoting 1 Weinstein's Evidence ¶ 401[07] (1985). This evidence is not cumulative because there was no evidence introduced at trial that established Izer's criminal history or propensity, although the issue was certainly raised by the defense cross examination of Izer.

While evidence that Izer stole drugs from a controlled buy conducted by the Task Force is impeachment evidence, it represents more than impeachment in this particular case. It represents direct evidence of what the defense argued at trial— that Izer is an addict who set Hernandez up to feed his drug habit.

Hernandez argued at trial that Izer worked as an informant in order to access drugs, which he clearly used regularly. Hernandez theorized that Izer may have taken his own drugs, and turned them over to the Washington County Narcotics Task Force claiming he bought them from Pelley and Barack. Izer was paid for his time, and in the process of setting up Hernandez, Izer ensured that he would be used in future controlled buys, which, in turn, meant that he could steal some of the crack purchased with prerecorded funds to feed his ongoing drug habit.

28

Notably, this was the first time the Washington County Narcotics Task Force used Izer as an informant[2]; therefore, Izer wanted to establish a reputation as someone who could "get the job done." Izer was incentivized to give away a small amount of his crack if it ensured that he would be able to steal larger amounts of crack in the future. The more the Task Force trusts the confidential informant, the more drugs the informant is authorized to buy, as evidenced by the increasing amounts of prerecorded funds given to Izer in this case. Indeed, the amount of crack Izer was caught attempting to steal after the trial was twice the amount he gave to the Task Force in the first controlled buy in this case. Izer himself testified that he had been involved in one hundred or more buys. Giving away a small amount of his own crack would be a small price to pay if it would ensure that Izer would have access, through controlled buys, to the drugs he is addicted to—the same access he had for the past fourteen years.

The Government attacked Hernandez's theory in closing argument by suggesting that Izer lacked any "financial motive to lie" because he was paid less than the crack was worth. The Government went on:

> Was there any evidence that [Izer] hated Mr. Hernandez? Any evidence that he had a vendetta against him? There wasn't. Mr. Izer is a drug user, absolutely. But there's no evidence at all that he has a motive to lie about Mr. Hernandez. He broke the rules of the Narcotics Task Force. And he may have done it more than once.

---

[2] Izer had previously worked with other law enforcement agencies.

(J.A. 370).

The Government never addressed, however, that Izer's motive to lie may not have come from any animosity towards Hernandez or from some scheme to make a lot of money, but from an addiction and a related desire to maintain his method of procuring drugs for free and with limited risk of criminal prosecution.

Because this newly discovered evidence "directly support[s] some alternate theory of the crimes," it is not merely impeaching. *See Robinson*, 627 F.3d at 949. The District Court abused its discretion in finding otherwise.

### iii. The District Court abused its discretion in finding that Pat Izer's conduct is not material to this case.

"A defendant satisfies the materiality prong by showing that the evidence was 'material to the issues involved.'" *Moore*, 709 F.3d at 293 (quoting *Robinson*, 627 F.3d at 948). "[E]vidence is certainly material [if] it goes to whether another person committed the acts of which the jury found [the defendant] guilty." *Id.* at 294 (quoting *United States v. Piazza*, 647 F.3d 559, 569 (5th Cir. 2011)). Moreover, this Court has recognized that newly discovered evidence may be material when it goes "directly to the defendants' chief defense." *Robinson*, 627 F.3d at 950 (citing *Fulcher*, 250 F.3d at 254–55).

Evidence that Izer has, in fact, been caught stealing drugs from the Task Force goes directly to Hernandez's chief defense, namely: that Hernandez never sold crack to Izer, that Izer set up Hernandez, and that any testimony to the

30

contrary from Izer should be disregarded. The District Court erred in concluding that the newly discovered evidence was not material.

> ### iv. The District Court abused its discretion by ruling that the new evidence, if available at the time of the conviction, would not likely have resulted in Hernandez's acquittal at a new trial.

Although rulings on motions for new trials are committed to the sound discretion of the trial court, "'[a] district court by definition abuses its discretion when it makes an error of law.'" *United States v. Stitt*, 250 F.3d 878, 896 (4th Cir. 2001) (quoting *Koon v. United States,* 518 U.S. 81, 100 (1996)). In other words, "[o]ne of the ways in which a district court may abuse its discretion is in applying erroneous legal principles to the case." *Mason*, 52 F.3d at 1290.

In addressing the newly discovered evidence, Judge Motz stated that while "the information severely damages Mr. Izer's credibility, it does not disprove defendant's guilt." Judge Motz also stated that he "would not have convicted defendant based solely upon the credibility of Mr. Izer in the first instance. It was other evidence, including the testimony of Destini Allen, upon which the conviction was based." (J.A. 411).

In denying Hernandez's motion for a new trial, Judge Motz erroneously considered the effect that the new evidence of Izer's conduct would have on the evidence at trial as it was already presented.

The standard is not whether the new evidence, if introduced retrospectively into the existing trial, would result in an acquittal. The standard is whether the newly discovered evidence would "probably result in acquittal *at a new trial*." *Moore*, 709 F.3d at 292 (emphasis added). The fact that Judge Motz explicitly considered the newly discovered evidence in the context of the first trial demonstrates misapplication of the standard and legal error because the court was required to evaluate the newly discovered evidence in light of its probative value at a new, hypothetical trial.

At trial, Hernandez waived his right to a jury trial. Hernandez may not have chosen to waive his right to a jury trial in the context of the newly discovered evidence. Judge Motz was required to consider the newly discovered evidence in the context of a new, hypothetical jury trial. Judge Motz abused his discretion in failing to do so.

Moreover, Judge Motz essentially shifted the burden to Hernandez to "disprove" his own guilt in the context of a hypothetical new trial by stating that the new evidence did not "disprove" Hernandez's guilt, and therefore would not result in an acquittal. Such a shifting is a violation of Hernandez's most basic, fundamental right to be presumed innocent until proven guilty. *See In re. Winship*, 397 U.S. 358, 363–64 (1970).

**c. Even if this court finds that the newly discovered evidence is "merely impeaching," the District Court abused its discretion in denying Hernandez's motion for new trial because the government's case rested entirely on Pat Izer's testimony, and it is now known that Pat Izer is entirely unworthy of being believed.**

Even if this Court determines that Izer's attempt to steal drugs from the Task Force is merely impeachment evidence, it is impeachment evidence that utterly discredits the evidence presented to convict Hernandez of selling drugs and in fact, supports Hernandez's defense theory. Because Judge Motz's factual findings regarding the sale of drugs were all either directly from or predicated upon Izer's testimony, denial of the motion for a new trial was an abuse of discretion.[3]

Although this Court has not yet encountered such a case, it has recognized that there are certain situations "that would justify granting a new trial solely on the basis of newly discovered impeachment evidence." *Custis*, 988 F.2d at 1359. Specifically:

> If the Government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed because he had lied consistently in a string of previous cases, the district judge would have the power to grant a new trial in order to prevent an innocent person from being convicted.

---

[3] Although Allen testified that Hernandez was "VinRoc" and that "VinRoc" bought drugs from Allen, the only evidence that Hernandez sold drugs came from Izer. Apart from the fact that Allen's testimony is questionable because he readily admitted that he was only testifying in order to get his sentence reduced, Allen could not provide any evidence that Hernandez was involved in any way in the sale of drugs to Pelley or Izer, or, indeed, the sale of drugs at all.

*Id.* (quoting *Taglia*, 922 F.2d at 415).

This Court emphasized that, in order for a new trial to be granted in such a circumstance, there must "be a real concern that an innocent person may have been convicted." *Id.* at 1360 (citations omitted). Such a concern exists where, as here, the newly discovered evidence directly supports the main theory of the defense.

In *Custis*, the defendant was convicted for possession of cocaine and illegal possession of a firearm. After trial, the police officers who were witnesses at trial were indicted for perjury in securing a search warrant in an unrelated case. *Id.* at 1358. The defendant moved for a new trial, which the District Court granted. *Id.* The Government appealed. Prior to the appeal, the state dismissed the charges against the police officers without prejudice. This Court held that evidence of the officers' subsequent indictment was merely impeaching and did not warrant a new trial. That holding was based on the fact that there was a substantial amount of other evidence presented at trial, all of which corroborated the testimony of the officers who were subsequently indicted. Indeed, the defendant's own testimony was "largely consistent with that of the officers." *Id.* at 1360. This Court found that the defendant had not established "an exception to the general rule that the subsequent discovery of impeaching evidence does not justify a new trial." *Id.*

Unlike *Custis*, in this case, much of Izer's testimony was wholly uncorroborated. Pelley did not testify at trial. The officers readily admitted that

34

they could not identify Hernandez in either of the first two buys.  Moreover, the officers agreed that they could not identify Hernandez in the second two buys.  The only person who identified Hernandez as a drug seller was Izer.

Other jurisdictions have addressed motions for new trials based on subsequent misconduct of government agents and have consistently held that (unlike this case) when such evidence is corroborated by other evidence, it is merely impeaching.  As the Supreme Court of Kansas observed, "the common thread in [the] federal cases is the courts' consideration of the presence or absence of corroborating evidence as a factor in determining whether the newly discovered evidence is of such materiality that it is likely to produce a different result upon retrial." *State v. Norton*, 277 Kan. 432, 441, 85 P.3d 686, 692 (Kan. 2004) (citing *United States v. Orellana-Osorio*, 1998 WL 799164 (S.D.N.Y. 1998) (noting that evidence that the informant was arrested for drug possession after the trial did not warrant a new trial when the informants testimony was "extensively corroborated"); *United States v. Leon-Lopez*, 891 F.Supp. 138, 149 (S.D.N.Y. 1995) (noting that evidence that a confidential informant stole $700,000 from the government after trial did not warrant a new trial because the testimony of that informant was "extensively corroborated by other evidence at trial"); *United States v. Spencer*, 4 F.3d 115 (2d Cir. 1993) (holding that a new trial was not necessary when the crime lab chemist who testified against defendant was found to have

taken, and used, drugs from the crime lab, because "persuasive independent evidence" supported the conviction); *United States v. Sposato*, 446 F.2d 779 (2d Cir. 1971) (sating that a new trial was not warranted when the IRS agent, who was the principle witness against defendant, was criminally charged because no evidence was offered to contradict the IRS agent's testimony, and because the agent's testimony was corroborated at trial)).

Unlike the federal cases where substantial corroborating evidence existed, in this case, there is only one witness who testified that Hernandez dealt drugs to Robin Pelley—Izer. In fact, Izer is the one who led police to Pelley. There is only one witness who testified that he bought drugs from Hernandez—Izer.

Those two facts, that Hernandez sold Pelley drugs, and Hernandez sold Izer drugs, established the foundation for Agent Glines' affidavit to secure a warrant, established part of the foundation for Judge Motz's finding that the text messages between Allen and Hernandez were criminal in nature, and established part of the foundation for the finding that the room in 20107 Daniels Circle belonged to Hernandez. Izer was the only one who testified that Hernandez received prerecorded funds and that Hernandez sold drugs out of 20107 Daniels Circle.

The only other evidence that Hernandez participated in criminal activity came from Allen, who could not say that Hernandez sold drugs. Even the connection to Allen was partially established through Izer because Izer's

36

information led the police to find the phone with the text messages and the note recording Allen's phone number.

The overwhelming pattern of the evidence in this case is simple: it all flowed from Izer. Izer's testimony contaminates every piece of evidence and every conclusion that flows from it. Hernandez should have been allowed to present the evidence that directly supported his theory of defense in a new trial.

For these reasons, Judge Motz abused his discretion in declining to grant a new trial.

**II.      The District Court erred in finding that there was substantial evidence to support a finding of guilt beyond a reasonable doubt of conspiracy when there was no direct evidence linking Hernandez to drug dealing (apart from the testimony of the discredited confidential informant), and in finding sufficient evidence to support a conviction on the firearm charges when there was no evidence that Hernandez had any knowledge of or intent to possess the firearm.**

**a. Standard of Review**

In reviewing the sufficiency of the evidence used to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Although a defendant bears a heavy burden, insufficiency can be demonstrated in certain situations. *See, e.g.*, *U.S. v. Habegger*, 370 F.3d 441 (4th Cir. 2004).

37

### b. There was insufficient evidence to convict Hernandez of conspiracy to distribute and possession with intent to distribute crack in violation of 21 U.S.C. § 846.

In order to prove conspiracy to possess cocaine with an intent to distribute, "the Government must establish that: (1) an agreement to possess cocaine with intent to distribute existed between two or more persons; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of this conspiracy." *U.S. v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996) (en banc); *see United States v. Strickland*, 245 F.3d 368, 385 (4th Cir. 2001).

Hernandez does not dispute that the Government established that Allen had an agreement to possess cocaine with the intent to distribute with some persons. Nor does Hernandez dispute that Allen identified him at trial. However, the Government presented no evidence that Hernandez knew of any agreement to distribute or that Hernandez was part of such an agreement (apart from Allen's own testimony).

It is true, "a conspiracy generally is proved by circumstantial evidence." *Burgos*, 94 F.3d at 857. It is also true that a person "may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence." *United States v. Allen*, 716 F.3d 98, 103 (4th Cir. 2013) cert. denied, 133 S. Ct.

2819 (U.S. 2013) (quoting *United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993)).

This Court has made it very clear, however, that although the Government need only show a "slight connection" to the conspiracy, "slight evidence" of that actual conspiracy will not be sufficient to prove a defendant's guilt beyond a reasonable doubt. *Burgos*, 94 F.3d at 861. The term "slight" does "not describe the *quantum* of evidence that the Government must elicit in order to establish the conspiracy, but rather the *connection*." *Id.*

In this case, the Government did not prove that Hernandez had knowledge of the conspiracy or that he knowingly became a part of such a conspiracy, both of which must be proved beyond a reasonable doubt to prove conspiracy. The only evidence of a conspiracy came from Allen. Allen admitted that he was testifying to get his sentence reduced. (J.A. 297). Although Allen's testimony established that he intended to conspire with others to distribute cocaine, it did not establish that Hernandez intended to do the same.

While in some circumstances an inference can be made regarding intent and knowledge, this is not such a situation. Allen testified that he had never heard of Izer or Pelley. Allen did not state that he purchased drugs from Hernandez. In fact, Allen could not present any evidence that Hernandez sold drugs at all. The only direct evidence of Hernandez selling came from Izer. Izer's testimony,

39

however, is not credible for reasons stated above.  Therefore, the Government did not present sufficient evidence that Hernandez knew about or participated in a conspiracy.

### c. There was insufficient evidence to convict Hernandez of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) and of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g).

Title 18 of the United States Code, Section 924(c) provides for enhanced punishment if a person possesses a firearm in furtherance of a drug trafficking crime.  18 U.S.C.A. § 924.  The offense is two part:  the defendant must possess the firearm, and such possession must be "in furtherance" of a crime.  Section 922(g) prohibits a convicted felon from possessing a firearm.

Generally, when prosecuting under Section 924, the Government is permitted to prove merely constructive possession.  Constructive possession means that a person "intentionally exercised dominion and control over the firearm, or had the power and the intention to exercise dominion and control over the firearm." *United States v. Scott*, 424 F.3d 431, 436 (4th Cir.2005).  "The government can establish constructive possession by direct or circumstantial evidence." *United States v. Al Sabahi*, 719 F.3d 305, 311 (4th Cir. 2013) (citing *Burgos*, 94 F.3d at 873).

This Court has held that there are "many factors" which might allow a fact finder to conclude that a defendant was in possession of a firearm in furtherance of a drug trafficking crime. *United States v. King*, 628 F.3d 693, 701 (4th Cir. 2011) (citations omitted). Those factors might include the type of firearm, whether it is possessed legally or illegally, and the firearm's "proximity" to drugs. *Id.* (citations omitted).

Hernandez contends that just because the firearm was being used in furtherance of a drug trafficking crime, does not mean that he was the one who possessed it. Hernandez agrees that this firearm was possessed, by whoever possessed it, illegally. He also agrees that the firearm was in close proximity to prerecorded buy money, close to bullets, close to a scale, baggies, and a razor blade. However, none of these facts prove that Hernandez had either knowledge of, or the power or the intention to exercise control over, the firearm.

The Government did not present sufficient evidence to demonstrate that Hernandez possessed the firearm. The gun was in a closet in a room at 20107 Daniels Circle. Hernandez's identification, also found at 20107 Daniels Circle displayed a different address. The only evidence directly linking Hernandez to the gun was Allen's testimony that he had "seen" the gun before and that it was Hernandez's. The gun is completely nondescript. Even if Allen was telling the truth that Hernandez at one point had a gun, there is no way Allen could know that

the gun recovered from 20107 Daniels Circle was that particular gun. There was no evidence that Hernandez even knew the gun was in the room. There was no evidence that Hernandez had any power or intention to exercise control over the firearm.

Although it was stipulated that Mr. Hernandez is a prohibited person for purposes of Section 922(g), for the reasons stated above, the Government did not present sufficient evidence to demonstrate that Hernandez possessed the firearm, and therefore did not present sufficient evidence to prove a violation of Section 922(g).

## CONCLUSION

Hernandez's convictions should be reversed because they were based on insufficient evidence. In the alternative, this case should be remanded for a new trial in light of the newly discovered evidence.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 34(a), Hernandez respectfully requests that oral argument be heard.

Respectfully submitted,

_____/s/_____
John A. Bourgeois
Ezra S. Gollogly
Kramon & Graham, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202-3201
(410) 752-6030 (telephone)
(410) 539-1269 (facsimile)
jbourgeois@kg-law.com
egollogly@kg-law.com

*Attorneys for Appellant Vincent Hernandez*

Dated: October 30, 2013.

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

**No. 13-4452 (L)**          **Caption: United States of America v. Vincent Hernandez**

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements.

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [ X ]    this brief contains 10, 038 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [    ]    this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ X ]    this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font; *or*

    [    ]    this brief has been prepared in a monospaced typeface using _____ with _____.


_____/s/_____
John A. Bourgeois
Ezra S. Gollogly

Attorneys for Appellant, Vincent Hernandez

Dated:  October 30, 2013

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of October, 2013, a copy of

Appellant's Opening Brief was sent via the Court's electronic-filing system to all

counsel of record who are registered CM/ECF users and by e-mail to:

Peter M. Nothstein
Assistant United States Attorney
36 South Charles Street
Baltimore, Maryland 21201
(410) 209-4800
Peter.Nothstein@usdoj.gov


_____/s/_____
Ezra S. Gollogly